**PRECISION PIPING &
INSTRUMENTS, INC.,
Plaintiff,**

**v.**

**E.I. duPONT DE NEMOURS & COMPANY; Borg–Warner Chemicals, Inc.; Murray's Sheet Metal Company, Inc.; Jack Murray; Monroe Zickerman; William Gray; Specialty Piping Corporation; Mike Romine; Nitro Industrial Coverings, Inc.; John Martin; Rose Stemple; Parkersburg–Marietta Contractors Association; and Numerous John Does, Defendants.**

Civ. A. No. A:87–0191.

United States District Court,
S.D. West Virginia,
Parkersburg Division.

Feb. 27, 1989.

---

226

James M. Sturgeon, Jr., David K. Schwirian, Pauley, Curry, Sturgeon & Vanderford, Charleston, W. Va., Edward A. Matto, Bricker & Eckler, Columbus, Ohio, for plaintiff.

Gordon H. Copland, Irene M. Keeley, Steptoe & Johnson, Clarksburg, W. Va., Judson W. Calkins, E.I. duPont De Nemours & Co., Legal Dept., Wilmington, Del., for duPont and Gray.

Nicholas L. DiVita, Bowles, McDavid, Graff & Love, Charleston, W. Va., for Zickerman and Borg–Warner.

Robert T. Dunlevey, Gary W. Auman, Dunlevey, Mahan & Furry, Dayton, Ohio, Robert Full, Goodwin & Goodwin, Parkersburg, W. Va., for Romine, Murray, Specialty Piping, Stemple, Murray's Sheet Metal, Nitro Indus., Martin and Parkersburg–Marietta Contractors.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

This matter is currently before the Court on the Defendants' joint motion for summary judgment. The issues raised therein have been fully briefed.

### I. *Background*

This is an anti-trust action, prosecuted pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 and their state law counterparts, *W.Va.Code,* §§ 47–18–3 and 4,[1] respectively. The Plaintiff has also stated a cause of action for intentional interference with business and contractual relationships. Finally, the Plaintiff has asserted a claim for punitive damages. All the Defendants seek summary judgment as to each of these claims.

The Plaintiff Precision Piping Industries, Inc. (Precision Piping) is a mechanical contractor engaged in the pipefitting business. Prior to the commencement of this action, Precision Piping performed the majority of its work for the Defendants E.I. duPont De Nemours and Company (duPont) and Borg–Warner Chemicals, Inc. (Borg–Warner). Dana Beall is the President and sole shareholder of Precision Piping, and Bill Hale is its Field Superintendent and chief administrative officer.

The Defendant Parkersburg–Marietta Contractors Association (PMCA) is a trade association composed of construction contractors, (designated as "regular" members) and the users of construction services, (designated as "subscriber" members) located or operating in the Parkersburg, West Virginia—Marietta, Ohio, trade area. Subscriber members are not entitled to attend the monthly meetings of the PMCA, nor are they permitted to vote. The Defendant Rose Stemple is the Executive Director of the PMCA, but has no voting rights. The Defendant John Martin is the President of the PMCA and also serves as

---

**1.** Because the state anti-trust law is to be construed and applied consistent with federal law, *W.Va.Code,* § 47–18–16, the Court will address directly only the federal claims. Rulings on the federal claims will be equally applicable to the corresponding state law claims.

Section 47–18–3(a) of the West Virginia Code provides as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy and restraint

of trade or commerce in this State shall be unlawful."

Section 47–18–4 of the West Virginia Code provides as follows:

"The establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this State, by any persons for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful."

the representative of the Defendant Nitro Industrial Coverings, Inc. (NICO) to the PMCA.

The Defendants duPont and Borg–Warner are subscriber members of the PMCA. Both operate chemical plants in the Parkersburg area and are the largest users of pipefitting services in that area. The Defendant William Gray is a field manager at duPont and is its representative to the PMCA. The Defendant Monroe Zicherman is a construction manager at Borg–Warner and is its representative to the PMCA.

The Defendants Murray Sheet Metal Company, Inc., Specialty Piping Corporation, and NICO are regular members of the PMCA and are engaged in providing a variety of contracting services. Their representatives to the PMCA are the Defendants, Jack Murray, President and principal shareholder of Murray Sheet Metal, Mike Romine, President and principal shareholder of Specialty Piping, and John Martin, President of NICO.

The Defendants which are PMCA regular members and Precision Piping have in common their use of union pipefitters. On May 31, 1986, the collective bargaining agreement between the contractors and Local 565 of the Plumbers and Pipefitters Union (Local 565) expired. In order to retain certain benefits under the National Maintenance Agreement,[2] the regular members assigned their bargaining rights to the PMCA.[3] Rose Stemple, as Executive Director of the PMCA, represented the employers in the negotiations with Local 565.

Negotiations between PMCA and the Union began in June of 1986. Four months later, in October, a new agreement had not been consummated. On approximately October 15, 1986, Hale telephoned Stemple and notified her of Precision Piping's intention to negotiate a separate contract with the local. In November Precision Piping negotiated a separate agreement, which was approved by the Union.

On December 4, 1986, at a regular meeting of the PMCA, Precision Piping's action was discussed. Pursuant to the PMCA by-laws, the members in attendance decided to give notice to Precision Piping that they would be taking a vote on the issue of its expulsion from the PMCA. At the next regularly scheduled meeting on February 5, 1987, by secret ballot, the PMCA membership voted to expel Precision Piping from the association. Precision Piping sent no representative to that meeting, but did send a letter which was read to those in attendance. Additionally, the termination issue was discussed prior to the vote.

In December, 1986, duPont, after learning of the Plaintiff's independent negotiations with the Union, decided not to use Precision Piping's services any longer. In January, 1987, Borg–Warner suspended Precision Piping for a period of ninety days, although it allowed the Plaintiff to complete work in progress.[4]

Subsequent to the action taken by the PMCA through its members and that taken by duPont and Borg–Warner, Precision Piping brought this action. In its complaint, it alleged that the Defendants' conduct constituted a conspiracy in restraint of trade and resulted in monopolization, an attempt to monopolize, or a conspiracy to monopolize trade or commerce,[5] in violation of state and federal anti-trust laws. The Plaintiff has also alleged that the Defen-

---

2. The National Maintenance Agreement is a special agreement whereby, even in the event of a local strike, union members may continue to provide maintenance services at 90% of their ordinary hourly rate, but only if the employer does not engage directly in contract negotiations.

3. There is a dispute between the Defendants and the Plaintiff as to whether the assignment was valid for the duration of the negotiations or only for a ninety-day period. This dispute, however, is not material to the issues presented here.

4. Although Borg–Warner claims that Precision Piping was merely suspended from the plant for ninety days and that Precision Piping may return at any time, it has not done so. However, the duration of the suspension by Borg–Warner is not directly relevant to the issues presented by the instant motion.

5. The summary judgment briefing indicates to the Court that the only Section 2 claim being pursued by the Plaintiff is conspiracy to monopolize.

dants' conduct impermissibly interfered with its business and contractual relations and that the conduct was reckless, outrageous and malicious so as to entitle the Plaintiff to an award of punitive damages.

## II. *Summary Judgment Standards*

Much of the parties' briefing has been devoted to a discussion of applicable summary judgment law and the respective burdens it places on the moving and opposing parties. As pointed out by the Defendants, summary judgment practice has been liberalized recently by the United States Supreme Court's rulings in three cases. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). These cases, in accordance with the plain language of *Rule* 56, Federal Rules of Civil Procedure, make it clear that once the moving party has properly informed the Court that there are no genuine issues of material fact, *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553, the burden shifts to the nonmoving party to direct the Court's attention to specific facts establishing a genuine issue for trial. *Rule* 56(e). The movant's burden is slight in relation to that of the opponent. In this case, finding that the Defendants have met their burden, these principles dictate that, in order to survive the motion for summary judgment, the Plaintiff must show that it has developed sufficient evidence of each of the elements of its claims to raise a jury question.

*Matsushita*, the first of the recent summary judgment cases to be decided, is especially illuminating on this point in that it set forth summary judgment standards to be applied in an antitrust case. Of particular significance is the Court's pronouncement that "anti-trust law limits the range of permissible inferences from ambiguous evidence."[6] 475 U.S. at 588, 106 S.Ct. at 1357. The Court continued, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of anti-trust conspiracy." *Id.* (citing *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984) and *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 280, 88 S.Ct. 1575, 1588, 20 L.Ed.2d 569 (1968)). Restated, a nonmoving plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiff]." *Id.*

This standard dictates that the trial court must initially assess the weight of the evidence relevant to the existence of a conspiracy. It has been argued that the Court's function in this regard interferes with that of the finder of fact. *Id.* at 600–01, 106 S.Ct. at 1363–64 (White, J., dissenting). However, *Matsuhita* adds nothing to the Court's obligation to ascertain that evidence of sufficient quantity and quality has been presented from which reasonable minds could reach differing conclusions. Indeed, the Court's inquiry at the summary judgment stage is no different than that which it must make at the directed verdict stage. *See Anderson*, 477 U.S. at 249–52, 106 S.Ct. at 2510–12.

In summary, the recent developments in summary judgment law are important for their clarification of what is required of a nonmoving party in order to withstand a motion for summary judgment. The Court does note, however, given the inherent difficulty in proving conspiracy, that whether the Plaintiff in this case has met this burden should be considered carefully in light of a plaintiff's need to rely heavily on circumstantial evidence.

With all of this in mind, the Court now turns to the merits of the Plaintiff's claims.

## III. *Conspiracy*

■ A necessary element of both the Section 1 and Section 2 claims is the existence of a conspiracy, in restraint of and to

---

**6.** Although the Court was referring specifically to a Section 1 case, the inferences referred to related to proof of the existence of a conspiracy.

This statement, therefore, is also applicable to a Section 2 conspiracy claim.

monopolize trade, respectively.[7] The essence of a conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. Mere similarity of conduct by various persons and the fact that they have associated with each other and have assembled together and discussed common aims and interests is not necessarily sufficient to prove a conspiracy. On the other hand, however, there need not be evidence of an express or formal agreement or that the alleged conspirators stated directly among themselves the object of the conspiracy, the details thereof, or the means by which such purpose was to be accomplished. There must be, however, sufficient evidence presented at the summary judgment stage from which the jury could reasonably infer that the alleged members of the conspiracy came to a mutual understanding, either positively or tacitly, to try to accomplish a common and unlawful plan.

■ In anti-trust terms, the Plaintiff must present evidence indicating concerted action or consciously parallel behavior on the part of the Defendants. Independent or unilateral action by individual Defendants will not support a Sherman Act conspiracy claim. *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604 (4th Cir.1985).

■ In the instant case, it is not disputed that each of the Defendants have taken similar action by refusing to deal with the Plaintiff. Furthermore, there is ample evidence that each Defendant was motivated, at least in part, by the perception that the Plaintiff had undermined the collective bargaining process with Local 565. In addition there is evidence in this case of communications among the Defendants. Hale

has testified[8] that Stemple threatened Precision Piping with adverse action if it negotiated on its own and that she advised Gray of duPont regarding Precision Piping's intention to negotiate a separate contract. He further testified that Gray similarly threatened Precision Piping. There is also evidence that at a meeting among Stemple, Martin, Gray and another duPont employee, Precision Piping's intention to negotiate on its own was discussed. Hale's testimony also indicates that Stemple communicated with Borg–Warner employees that Precision Piping had negotiated its own contract with the Union and attempted to convince Borg–Warner to join a boycott against the Plaintiff. Finally, although each PMCA member has sworn that it acted independently in voting to expel Precision Piping from the association, the expulsion vote was scheduled in advance at the December meeting and there was some discussion of Precision Piping's conduct at both the December and February meetings.

The Court believes that the character and combination of the evidence presented by the Plaintiff thus far is sufficient to present a jury question regarding the existence of a conspiracy. In other words, the Plaintiff has met its burden of establishing evidence tending to exclude the possibility that the Defendants acted independently. *Monsanto*, 465 U.S. at 768, 104 S.Ct. at 1473.

In so ruling, the Court does not address the question which arises with respect to the capacity in which the individual Defendants acted. It will be for the jury to decide whether the Defendants' alleged conduct subjects them individually or the organizations they represent to liability, if at all.

---

7. Section 1 of the Sherman Act provides in pertinent part as follows:
   "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal[.]"
   15 U.S.C. § 1.
   Section 2 provides in pertinent part as follows:
   "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopo-

lize any part of the trade or commerce among the several States, ... shall be ... guilty of a [violation of federal anti-trust laws]."

8. At this point, the Court presumes the admissibility of Hale's testimony regarding the statements of others. The Plaintiff has addressed this question in its response to the instant motion, and the Defendants, in their reply, have not taken issue with the Plaintiff's position that such testimony would be admissible.

#### IV. *Section One*

A necessary element of a Section 1 claim is that the conduct complained of resulted in a restraint of or that it had anti-competitive effect on trade. Independent proof of anti-competitive effect is unnecessary in the case of a *per se* violation of Section 1 of the Sherman Act. The Court does not believe, however, that this case is susceptible to a *per se* approach because the practice complained of is not such that it would always result in an anti-competitive effect. *Northwest Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289–90, 105 S.Ct. 2613, 2616–17, 86 L.Ed.2d 202 (1985). Particularly, the Court notes that Defendants' argument that refusal to deal with the Plaintiff has the potentially procompetitive effect of maintaining low construction prices. Accordingly, the Court determines that the existence of a relevant market is an essential element of the Plaintiff's Section 1 claim, under the rule of reason approach, by which Section 1 is interpreted to prohibit only unreasonable restraints of trade.

With respect to this element, it is necessary that the Plaintiff define relevant geographic and product markets.[9] Proof of relevant market provides a point of reference for determining anti-competitive effect as that term relates to a Section 1 claim. *Jayco Systems, Inc. v. Savin Business Machines Corp.*, 777 F.2d 306, 319 (5th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986).

The Plaintiff has responded to the Defendants' contention that it has failed to define a relevant market by suggesting a product market consisting of local pipefitting and maintenance contract services and a geographic market ranging from the local Borg–Warner and duPont plants to all plants in the Mid–Ohio Valley which use such services. The Court believes that the jury might reasonably find the identified product market to be an appropriate one under the facts in this case. Furthermore, the Plaintiff's identification of a range of geographic markets is sufficient to place that question before the jury, in that it could reasonably find, within that range, " 'an area in which the Defendants operate and which the Plaintiff can reasonably turn to for supplies.' " *RCM Supply Co. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1077 (4th Cir.1982) (quoting the District Court's charge to the jury) (emphasis omitted).

In addition to proving conspiracy and relevant market, the Plaintiff also bears the burden of presenting evidence on the remaining elements of this claim, namely, that the Defendants' alleged conduct unreasonably restrained, or had an anti-competitive effect upon, trade, and that the Plaintiff was injured thereby. In other words, the Plaintiff "must show harm to competition in general, as well as its own injury as a competitor." *L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 421 (11th Cir.1984).

Evidence that the Plaintiff's two largest sources of business were eliminated, among other things, would be sufficient to support a finding of injury to the Plaintiff. Because a finding of anti-competitive effect is largely dependent upon the jury's determination with respect to relevant market, the Court also reserves this question for the jury.

#### V. *Section Two*

Having presented evidence regarding the conspiracy element of its Section 2 claim, the Plaintiff now must make a sufficient showing as to the remaining elements, including an overt act in furtherance of the conspiracy and the Defendants' specific intent to monopolize.

■ The Plaintiff identifies as an overt act of the conspiracy to monopolize the boycott of Precision Piping. Evidence of such conduct on the part of the Defendants would be sufficient to support a jury's finding that it was done in furtherance of the

---

**9.** Although relevant market is a necessary element to a monopolization claim under Section 2, it does not appear to be essential to a Section 2 conspiracy to monopolize claim, *cf. Continental Ore Co. v. Union Carbide Carbon Corp.*, 370 U.S. 690, 709–10, 82 S.Ct. 1404, 1415–16, 8 L.Ed. 2d 777 (1962); although relevant market may provide a point of reference in considering the issue of intent to monopolize.

conspiracy. Likewise, the specific intent necessary to establish a conspiracy claim under Section 2 may be inferred from evidence which would also support a finding of anti-competitive effect under Section 1. *See, e.g., William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1027–28 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

## VI. *Tortious Interference and Punitive Damages*

In order to establish a prima facie case of tortious interference with prospective contractual relationships, the Plaintiff must show:

"(1) existence of a contractual or business relationship or expectancy;

(2) an intentional act of interference by a party outside that relationship or expectancy;

(3) proof that the interference caused the harm sustained; and

(4) damages."

*Torbett v. Wheeling Dollar Savings & Trust Co.,* syl. pt. 2, —— W.Va. ——, 314 S.E.2d 166 (1983).

■ While the Court believes that the record is not as clear as it could be as to the particular evidence with which the Plaintiff intends to prove its claim of tortious interference, the Court notes generally that the evidence upon which the Plaintiff will rely to prove its anti-trust claims could form the basis of its tortious interference claim. Accordingly, the Court will permit the Plaintiff to proceed on this claim, keeping in mind certain guiding principles.

First, the Plaintiff must prove each and every element of this cause of action, as set forth in *Torbett.* Speculation as to the existence of a contractual or business relationship or expectancy is insufficient to establish that element. Second, the act of interference must be that of a third party to the contractual or business relationship. In other words, as the Defendants correctly point out, an employee of a particular Defendant cannot, as a matter of law, be held liable for tortiously interfering with the relationship between the Plaintiff and that Defendant.

As to the Plaintiff's claim for punitive damages, the Court notes first that if it prevails on any of its anti-trust claims, it is entitled to the recovery of treble damages. 15 U.S.C. § 15 and *W.Va.Code,* § 47–18–9. Punitive damages, therefore, are recoverable, if at all, for the conduct alleged by the Plaintiff's tortious interference claim. Furthermore, an award of punitive damages is appropriate only in a case involving extreme conduct which might be described as malicious, wanton, willful or reckless. *Cook v. Heck's,* —— W.Va. ——, 342 S.E.2d 453 (1986).

Consistent with its opinion that the same evidence presented by the Plaintiff on its anti-trust claims might also form the basis of its tortious interference claim, the Court is further of the opinion that if such evidence proves insufficient to support the anti-trust claims and a statutory award of treble damages, then the Plaintiff should not be entitled to recover punitive damages on its tortious interference claim. Stated differently, the Court concludes that if the evidence presented in this case will not support the anti-trust claims, then it is insufficient as a matter of law to establish the extreme degree of conduct necessary to support an award of punitive damages.

## VII. *Conclusion*

Based on the foregoing, the Court denies the Defendants' motion for summary judgment on the Plaintiff's anti-trust and tort claims—Counts One through Five of the complaint—and grants the motion with respect to the Plaintiff's claim for punitive damages—Count Six.