ENERGY MARKETING SERVICES, INC., Plaintiff,

v.

COLUMBIA GAS TRANSMISSION CORPORATION, et al., Defendants.

AGF, Inc., Plaintiff,

v.

Columbia Gas Transmission Corporation, et al., Defendants.

Advantage Energy Marketing, Inc., Plaintiff,

v.

Columbia Gas Transmission Corporation, et al., Defendants.

1564 East Lancaster Avenue Business Trust, Plaintiff,

v.

Columbia Gas Transmission Corporation, et al., Defendants.

Civil Action Nos. 2:04–0869, 2:04–0870, 2:04–0871, 2:04–0872.

United States District Court, S.D. West Virginia, Charleston Division.

April 21, 2009.

Joshua I. Barrett, Lonnie C. Simmons, Robert M. Bastress, III, Rudolph L. Ditrapano, Sean P. McGinley, Ditrapano Barrett & Dipiero, Charleston, WV, Robert C. Sanders, Law Office of Robert C. Sanders, Upper Marlboro, MD, for Plaintiffs.

G. Hamilton Loeb, Paul Hastings Janofsky & Walker, Avery Gardiner, James W. Draughn, Jr., Michael S. Becker, Thomas M. McDermott, Kirkland & Ellis, Washington, DC, Johnny M. Knisely, II, Thomas R. Goodwin, Goodwin & Goodwin, Erica M. Baumgras, Jeffrey M. Wakefield, Flaherty Sensabaugh & Bonasso, John H. Tinney, Jr., The Tinney Law Firm, Charleston, WV, for Defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT C. CHAMBERS, District Judge.

Pending before the Court are the Renewed and Incorporated Motions for Sum-

mary Judgment (doc. 148, Ex. 2, in each of the above-captioned matters) of Defendant Columbia Gas Transmission Corporation (TCO). For the following reasons, the Court **GRANTS in part** and **DENIES in part** these motions.

## I. FACTS

On August 19, 2008, 2008 WL 3891219, the Court denied Plaintiffs' renewed motion for class certification. In that order, the Court discussed the underlying facts of this case in considerable detail. Accordingly, the Court will not repeat those facts here. Rather, the Court adopts and refers to the factual summary as laid forth in the August 19 Memorandum Opinion and Order.

Since the Court's entry of that opinion and order, the Federal Energy Regulatory Commission (FERC) approved a stipulation and consent agreement between its Office of Enforcement and TCO. *November 6, 2008 Order Approving Stipulation and Consent Agreement,* 2:04–cv–869, doc. 163–3. This order was the second of two events that prompted TCO to file the instant renewed and incorporated summary judgment motions. *TCO's Memorandum in Support,* at p. 1. The first event was the United States Supreme Court's decision in *Credit Suisse Sec. (USA) LLC v. Billing,* 551 U.S. 264, 127 S.Ct. 2383, 168 L.Ed.2d 145 (2007). According to TCO, *Credit Suisse* stands for the proposition "that conduct subject to comprehensive oversight by a federal regulatory agency can be 'clearly incompatible' with, and hence immune from, the antitrust laws." *TCO's Memorandum in Support,* at p. 1 (quoting *Credit Suisse,* 127 S.Ct. at 2397). TCO argues that because the November 6, 2008 FERC Order "condones and approves the practice upon which Plaintiffs' entire theory of damage causation here is premised ..., then surely the *Credit Suisse* rule applies," and Plaintiffs cannot end-run

FERC oversight through the application of other laws. *Id.* at p. 2.

However, whether the recent FERC order actually "condones and approves the practice upon which Plaintiffs' entire theory of damage causation here is premised" is itself a subject of a contentious factual dispute between the parties. *Id.* TCO argues that Plaintiffs' theory consists of the following:

TCO entered into long-term PAL [parking and lending] transactions with specific beginning and ending dates, that TCO failed to *recall* (*i.e.* demand back) outstanding PAL balances when PAL (and other transportation services) were interrupted. Plaintiffs contend that these outstanding and unresolved long-term PAL balances led to the nomination "cuts" upon which they would base their accusations of "illegality" and from which they would calculate all of their asserted damages.

*TCO's Memorandum in Support,* at p. 2–3 (emphasis in original) (internal citations omitted). In TCO's view, "FERC condone[d] and approve[d] [these] practice[s]" when, in the November 6 Order:

FERC found no irregularity in long-term PAL transactions, or in specific commencement and termination dates. Moreover, it expressly and affirmatively [concluded that] ... TCO is *not* required to recall outstanding balances during the duration of a PAL service agreement, notwithstanding intervening interruptions of PAL or other, higher-priority services.

*TCO's Memorandum in Support,* at p. 3 (emphasis in original).

TCO further claims that "[f]or IPP [interruptible paper pool] imbalances to have had anticompetitive *effects* and to have caused antitrust injury under the Sherman Act, it must have been improper for TCO to maintain the imbalance at the time of

the supposed harm to each plaintiff." *TCO's Reply*, at p. 8–9 (emphasis in original). TCO believes that damages based on IPP imbalances fail for the same reason as those based on PAL imbalances: "Without the premise that TCO was obligated to recall PAL volumes when the pipeline became tight, the assertion that harm was caused by TCO on days when plaintiffs' nominations were not accepted simply evaporates." *TCO's Reply*, at p. 9. In any event, TCO notes that "Plaintiffs do not even attempt any damages calculation based on IPP imbalances." *Id.*

Plaintiffs dispute the notion that either the November 6, 2008 Order, or the earlier October 23, 2008 Stipulation and Consent Agreement which it approved, "condones [or] approves" the practices upon which they base their causation and damages theory. *Plaintiffs' Response*, at p. 18 (quoting *TCO's Memorandum in Support*, at p. 2). As an initial matter, they point out that FERC's "Second Disgorgement Order [the November 6, 2008 Order] certainly does not condone (or even address) the illegal park and loan transactions during the period covered by the First Disgorgement Order [entered October 25, 2000]." *Id.* They also characterize their causation and damages theory in regards to the conduct covered by the November 6, 2008 Order differently than Defendants. They state that:

> [Their] complaint as to that conduct is that TCO utilized PAL and IPP services to illegally convert its PAL service, the lowest priority and most interruptible of all TCO services, into a "firm" long term service for an expanded group of select shippers by allowing them to maintain IPP imbalances (positive imbalances for the parks and negative imbalances for the loans).

*Id.* at p. 18–19. They further state that this conduct "is precisely what the FERC found to be illegal in the Second Disgorge-ment Order." *Id.* at p. 19 (citing *November 6, 2008 Order Approving Stipulation and Consent Agreement*, 2:04–cv–869, doc. 163–3, at p. 3).

Plaintiffs argue that TCO's focus on the fact that FERC concluded that TCO need not recall PAL imbalances when PAL services are posted as "not available" ignores their "underlying point ... that the PAL imbalances recorded as IPP imbalances never should have been permitted in the first place, and that the existence of these imbalances caused constraints in the system that resulted in cuts to plaintiffs' nominations and other commercial harm." *Id.* Plaintiffs insist that "[i]t is the existence of the imbalances that is at the core of all of plaintiffs' damage claims, and the FERC agrees in the Second Disgorgement Order that the existence of those imbalances was illegal." *Id.*

## II. SUMMARY JUDGMENT STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reason-

able juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III. DISCUSSION [1]

### A. Federal and State Antitrust Claims

■ TCO claims that Plaintiffs' antitrust claims are precluded by *Credit Suisse*.[2] In that case, a group of investors filed two antitrust class-action lawsuits against several investment banks that "had acted as underwriters, forming syndicates that helped execute the IPOs [initial public offerings] of several hundred technology-related companies." *Credit Suisse*, 127 S.Ct. at 2388. The investors alleged that the underwriters (banks) had violated anti-trust laws "by agreeing among themselves to impose harmful conditions upon potential investors." *Id.* The alleged harmful conditions consisted of various " 'additional anticompetitive' charges over and above the agreed-upon IPO share price plus underwriting commission." *Id.* at 2389. "The underwriters moved to dismiss the investors' complaints on the ground that federal securities law impliedly precludes application of antitrust laws to the conduct in question." *Id.* The District Court for the Southern District of New York dismissed the complaints, the Court of Appeals for the Second Circuit reversed the district court, and the Supreme Court in turn reversed the circuit court. *Id.*

The Supreme Court framed the issue before it as "whether there was a 'plain repugnancy' between the[ ] antitrust claims and the federal securities law." *Id.* (quoting *Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 682, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975)). The Court noted that "[w]here regulatory statutes are silent in respect to antitrust, ... courts must determine whether, and in what respects, they implicitly preclude application of the antitrust laws." *Id.* It further observed

---

1. In the instant motions, TCO argues that Plaintiffs' unjust enrichment claims "are untenable for the same reasons that the antitrust claims are untenable, *i.e.* the rule of *Credit Suisse*." TCO's Memorandum in Support, at p. 14. In light of the Court's findings regarding the antitrust claims and *Credit Suisse*, discussed below, this argument does not behoove TCO. However, because the Court finds Plaintiffs' unjust enrichment claims untenable for reasons more fully discussed in the Court's order addressing Defendants' comprehensive motions for summary judgment, the Court grants summary judgment to TCO as to Plaintiffs' unjust enrichment claims.

2. TCO also claims that *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004), precludes Plaintiffs' antitrust claims because that case "showed that violations of a regulatory regime aimed at promoting competition cannot also transgress antitrust law unless they would have done so in the absence of the regulatory regime." TCO's Memorandum in Support, at p. 8. However, the Court continues to believe, as it explained in its denial of Defendants' motion to dismiss, that "Defendants [including TCO] have not demonstrated that this case involves the same level of regulatory overlay and unique market found in *Trinko*." June 14, 2005 Memorandum Opinion and Order, 373 F.Supp.2d at 641. Thus the Court rejects TCO's contention that *Trinko* compels summary judgment as to Plaintiffs' antitrust claims. To the contrary, the Court continues to "find[ ] *Otter Tail* [*Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973),] more closely on point." *See id.* at 641.

that "[t]hose determinations may vary from statute to statute, depending upon the relation between the antitrust laws and the regulatory program set forth in the particular statute, and the relation of the specific conduct at issue to both sets of laws." *Id.* The Court then reviewed, in detail, "three [of its] decisions ... [that] specifically address the relation of securities law to antitrust law." *Id.* After completing its review, the Court concluded that these securities/antitrust cases "make clear that, when a court decides whether securities law precludes antitrust law, it is deciding whether, given context and likely consequences, there is a 'clear repugnancy' between the securities law and the antitrust complaint-or as we shall subsequently describe the matter, whether the two are 'clearly incompatible.'" *Id.* at 2392.

To determine clear incompatibility, the Court employed the factors it deemed "critical" in two of the three securities/antitrust cases that it had reviewed: *Gordon,* 422 U.S. 659, 95 S.Ct. 2598, and *United States v. National Ass'n of Securities Dealers [NASD],* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975). These included:

> (1) the existence of regulatory authority under the securities law to supervise the activities in question; (2) evidence that the responsible regulatory entities exercise that authority; and (3) a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct.

*Credit Suisse,* 127 S.Ct. at 2392. It "also note[d] (4) that in *Gordon* and *NASD* the possible conflict affected practices that lie squarely within an area of financial market activity that the securities law seeks to regulate." *Id.*

The Court found, with little difficulty, that the first, second, and fourth factors

had been met. *Id.* at 2393. It therefore turned its focus to the third factor, the risk of conflict between the securities and antitrust laws. The investors argued that the relevant regulatory authority, the Securities and Exchange Commission (SEC), had disapproved of the additional charges imposed by the underwriters, and therefore there was little or no risk of conflict with the antitrust laws. *Id.* at 2394. However, the Court rejected this claim, even assuming that the SEC would continue to disapprove of the charges in the future. Rather, the Court found that "securities law and antitrust law are clearly incompatible." *Id.*

Analysis of the third factor, risk of conflict, itself involves two elements. First, the Court considered whether antitrust actions could harm the securities market. On this point, the Court concluded that, even if the SEC were likely to disapprove of the conduct attacked in antitrust actions, "permit[ting] antitrust actions ... *still* threatens serious securities-related harm" because the securities context presents "an unusually serious legal line-drawing problem." *Id.* (emphasis in original). The Court continued: "In the present context only a fine, complex, detailed line separates activity that the SEC permits or encourages (for which [the investors] must concede antitrust immunity) from activity that the SEC must (and inevitably will) forbid (and which, on [the investors'] theory, should be open to antitrust attack)." *Id.* This observation led the Court to express doubt that anyone "but a securities expert" could perform the necessary line-drawing. *Id.* Another potential problem was the fact that "evidence tending to show unlawful antitrust activity and evidence tending to show lawful securities marketing activity may overlap, or prove identical." *Id.* at 2395. Consequently, the same evidence might be used to demonstrate both SEC compliance and violation

of antitrust laws. *Id.* Finally, the Court expressed concern over different, nonexpert judges and juries evaluating antitrust claims in the securities market throughout the country, particularly in light of the "unusually high risk that different courts will evaluate similar factual circumstances differently." *Id.*

These concerns led the Court to conclude that "there is no practical way to confine antitrust suits so that they challenge only activity of the kind the investors seek to target, activity that is presently unlawful and will likely remain unlawful under the securities law." *Id.* Therefore, "antitrust courts are likely to make unusually serious mistakes" in the securities context. *Id.* at 2396. The result of these mistakes would be that:

> underwriters [would have to] act in ways that will avoid not simply conduct that the securities law forbids (and will likely continue to forbid), but also a wide range of joint conduct that the securities law permits or encourages (but which they fear could lead to an antitrust lawsuit and the risk of treble damages).

*Id.*

The Court acknowledged that "[t]his kind of problem exists to some degree in respect to other antitrust lawsuits." *Id.* However, the Court also concluded that in the case before it "the factors ... mentioned [above] make mistakes unusually likely" and "the securities-related costs of mistakes unusually high." *Id.* These considerations led the Court to a rather circumscribed finding regarding the first element of the conflict analysis:

> [W]here conduct at the core of the marketing of new securities is at issue; where securities regulators proceed with great care to distinguish the encouraged and permissible from the forbidden; where the threat of antitrust lawsuits, through error and disincentive, could seriously alter underwriter conduct in

undesirable ways, to allow an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities market.

*Id.*

Next, the Court considered the second element of the conflict analysis, the need for enforcement of antitrust law. The Court found that "any enforcement-related need for an antitrust lawsuit is unusually small" in the securities context because: (1) "the SEC actively enforces the rules and regulations that forbid the conduct in question[;]" (2) "investors harmed by underwriters' unlawful practices may bring lawsuits and obtain damages under the securities law[;]" and (3) "the SEC is itself required to take account of competitive considerations when it creates securities-related policy and embodies it in rules and regulations." *Id.*

The parties in this case argue over the existence of all four *Credit Suisse* factors, including the dual considerations that comprise the third factor, the risk of conflict between industry-specific regulatory laws and the more general antitrust laws. However, because this Court agrees with Plaintiffs that FERC's regulatory oversight does not involve the same level of risk of conflict with antitrust laws as the SEC's regulatory oversight did in *Credit Suisse,* and thus the vital third factor is not present in this case, the Court need not address the existence of the first, second, and fourth factors discussed in *Credit Suisse.*

In regards to this third factor, TCO argues that "if the complex and heavily nuanced line-drawing that FERC and its regulated entities must undertake is second-guessed by non-expert courts and juries applying antitrust laws, there is a great danger of conflicting and erroneous results." *TCO's Memorandum in Support,* at p. 10. TCO believes this danger

persists "even if given conduct [is] currently condemned by both antitrust verdicts and FERC [because] independent application of antitrust law could tie FERC's hands as regards future adjustments-or even wholesale changes-to its regulatory regime." *Id.* According to TCO:

> FERC has crafted the current competitive environment to maximize the efficiency of the nation's gas transportation system, and fears of unpredictable antitrust liability could cause pipelines to shrink from offering services—yes, like parking and lending—that FERC has approved and that benefit the public through optimal use of pipelines' existing plant and equipment.

*Id.*

Plaintiffs respond that neither of the risk of conflict factor's twin requirements are present here. "First, the coexistence of FERC oversight and the antitrust laws creates no risk that TCO would [sic] on the receiving end of 'conflicting guidance, requirements, duties, privileges, or standards of conduct'" because, "[b]y contrast [to *Credit Suisse*], the circumstances and regulatory environment in this case bear no resemblance whatsoever to the finely tuned regulation of 'conduct at the core of marketing new securities' that the Court felt the need to insulate from antitrust law in *Credit Suisse*." *Plaintiff's Response*, at p. 11–13 (quoting *Credit Suisse*, 127 S.Ct. at 2392, 2396). Plaintiffs also observe that the Supreme Court found *Credit Suisse* to be an "unusual" case. It involved "an unusually serious legal line-drawing problem," "an unusually high risk that different courts will evaluate similar factual circumstances differently," and an "unusual[ ] likel[ihood]" of "unusually serious mistakes" with "unusually high" costs. *Credit Suisse*, 127 S.Ct. at 2395, 2396. Furthermore, Plaintiffs argue that TCO's conduct was "patently illegal," and thus there is "no danger that TCO could be found liable

for conduct that the FERC permits." *Plaintiffs' Response*, at p. 13.

Second, Plaintiffs maintain that, unlike in *Credit Suisse*, the natural gas industry does not have an "unusually small" "enforcement-related need for ... antitrust lawsuit[s]." *Credit Suisse*, 127 S.Ct. at 2395, 2396. Plaintiffs observe that the Court in *Credit Suisse* found a limited need for antitrust suits, in part, because "the SEC is required to take into account competitive considerations when it creates securities related policy," thus "mak[ing] it somewhat less necessary to rely on antitrust actions to deter anticompetitive behavior." *Plaintiffs' Response*, at p. 13. They point out that this Court, in denying Defendants' motions to dismiss, already has found "that the FERC's authority to remedy anticompetitive behavior is limited." *Id.* Therefore, Plaintiffs argue that the second factor under the risk of conflict analysis is also missing from this case.

The Court finds that TCO has not made a strong case for the potential applicability of *Credit Suisse* to this case. *Credit Suisse* dealt with the intersection of securities law and antitrust law. Its four-factor test was derived from cases that "address[ed] the relation of securities law to antitrust law." *Credit Suisse*, 127 S.Ct. at 2389. The Supreme Court in *Credit Suisse* suggested that that case shared similarities with other antitrust cases, but it also highlighted that the securities context—or, at a minimum, the facts of *Credit Suisse*—presented a variety of "unusual[ ]" concerns. *See id.* at 2396 ("This kind of problem [as existed in *Credit Suisse*] exists to some degree in respect to other antitrust lawsuits. But here the factors we have mentioned make mistakes unusually likely...."). The Court makes no finding as to the scope of *Credit Suisse*, other than to say that the facts of this case do not place it under *Credit Suisse*. The

Court also notes that TCO has failed to cite any case applying the *Credit Suisse* framework outside of the securities context.

In any event, assuming *Credit Suisse*'s potential applicability, the Court agrees with Plaintiffs that the third portion of the case's four-part analysis, the risk of conflict between the regulatory laws and the antitrust laws, is not present in this case. First, permitting the antitrust claims at issue does not "threaten[ ] serious ... harm" to the relevant market as in *Credit Suisse*. *Id.* at 2394. The unique workings of the securities industry create an "unusually high risk" of "unusually serious mistakes" resulting in "unusually high" "costs," or harm, that is simply not present here. *Id.* at 2395–96.

In the securities market, joint action is integral to the activity which the SEC both encourages and regulates. That joint action necessarily exposes the participants to antitrust complaints because they engage in sophisticated financial arrangements in concert. Here, the relationship between an interstate natural gas pipeline and shippers of natural gas on the pipeline conforms to a more traditional business model. Although the natural gas industry is undoubtedly complex, the roles of the pipeline and the shippers are fundamentally common—the pipeline is the seller of transportation and storage services and the shippers are purchasers of those services. Shippers and the pipeline do not act "jointly" in the way described in *Credit Suisse*. *See id.* at 2392 ("[T]he activities in question here—the underwriters' efforts jointly to promote and to sell newly issued securities—is central to the proper functioning of well-regulated capital markets.") Finding the joint activity central to the market and noting the SEC's "considerable power to forbid, permit, encourage, discourage, tolerate, limit, and otherwise regulate virtually every aspect of the prac-

tices in which underwriters engage," the Court observed the "unusually serious legal line-drawing problem" which antitrust claims would complicate. *See id.* at 2394 ("[T]o permit antitrust actions such as the present one *still* threatens securities-related harm.... In the present context only a fine, complex, detailed line separates activity that the SEC permits or encourages ... from activity that the SEC must (and inevitably will) forbid....").

Second, and also contrary to *Credit Suisse*, there is a considerable "enforcement-related need for ... antitrust lawsuit[s]" in the natural gas context. *Id.* at 2396. In its reply, TCO denies this fact, arguing that "Congress has given [FERC] broad authority to regulate fraudulent or anticompetitive conduct in the natural gas market," including "extensive authority to promulgate (and enforce) rules promoting transparency in natural gas markets, 15 U.S.C. § 717t–2, which rules take into account 'fair competition.' " *TCO's Reply*, at p. 6. In TCO's view, "FERC has fashioned the relevant playing field precisely as it likes, and it can tinker and reform as it likes, when it likes." *Id.* at p. 5.

Undoubtedly, as this Court has previously found, "FERC regulates the rates for transporting and selling natural gas in interstate commerce." *June 14, 2005 Memorandum Opinion and Order*, 373 F.Supp.2d 631, 641 (S.D.W.Va.2005). It also "facilitate[s] price transparency for the sale or transportation of physical natural gas in interstate commerce," out of a "due regard for ... fair competition." 15 U.S.C. § 717t–2(a)(1). Plaintiffs attempt to convince the Court that "FERC certainly does not actively enforce the rules and regulations forbidding the challenged conduct." *Plaintiffs' Response*, at p. 16. While the Court has considerable difficulty accepting Plaintiffs' assertions, the Court does believe that, unlike the securities in-

dustry, the natural gas industry does not have an "unusually small" "enforcement-related need for . . . antitrust lawsuit[s]." *Credit Suisse*, 127 S.Ct. at 2396.

Importantly, as the *Credit Suisse* Court observed, "[p]rivate individuals who suffer harm as a result of a violation of pertinent statutes and regulations may also recover damages" under the Securities Exchange Act. *Id.* at 2393 (citing 15 U.S.C. §§ 78bb, 78u–4, 77k). These carefully crafted provisions seek to regulate the coexistence of SEC enforcement and private litigation. *See* 15 U.S.C. §§ 78bb(a), 78u–4, 77k(a). Traditional antitrust suits might conflict with this regulation. This fact contributes to the unusual lack of a need for antitrust suits in the securities context. No similar special private actions, which might be compromised by antitrust claims, accompany FERC's regulatory scheme.

Further, the Court also believes that the natural gas industry is distinguishable from the securities industry because FERC appears to wield somewhat less authority to remedy anticompetitive behavior than the SEC. As the Court has already stated, "FERC's [first] order provided relief limited to disgorging the Pipeline Defendants' [including TCO's] ill-gotten profits and a small rebate of SIT fees, neither of which purported to address any anticompetitive results of the scheme." *June 14, 2005 Memorandum Opinion and Order*, 373 F.Supp.2d at 641. FERC's second order only required TCO to disgorge profits and agree not to provide park or loan services to any customer when that service is posted as "not available." *November 6, 2008 Order Approving Stipulation and Consent Agreement*, 2:04–cv–869, doc. 163-3, at p. 4–5. It therefore also did little "to address any anticompetitive results of the scheme." *June 14, 2005 Memorandum Opinion and Order*, 373 F.Supp.2d at 641. Both of these disgorgements resulted from negotiations between FERC and TCO. In relation to both disgorgements, Plaintiffs claim damages in a far larger amount and of a different type than that which was disgorged. Prior to *Credit Suisse*, the Court found that "FERC's authority to remedy anti-competitive behavior is decidedly less than the regulatory authority in *Trinko*," 373 F.Supp.2d at 641, and refused to find that case controlling. Now the Court makes a similar finding in regards to *Credit Suisse*. FERC lacks the authority to remedy anticompetitive behavior that the SEC wielded in *Credit Suisse*. In the natural gas context, there is an "enforcement-related need for . . . antitrust lawsuit[s]." *Credit Suisse*, 127 S.Ct. at 2396. Summary judgment as to Plaintiffs' antitrust claims would be improper.

## B. Contract Claims

■ TCO contends that Plaintiffs' contract claims "are untenable for the same reasons that the antitrust claims are untenable, *i.e.* the rule of *Credit Suisse*." *TCO's Memorandum in Support*, at p. 14. According to TCO, "[t]his case is no commonplace contract enforcement action. The line-drawing that Plaintiffs here would ask a jury to perform in finding that TCO failed to comply with its tariff and General Terms obligations would . . . disrupt[ ] . . . the finely tuned FERC regulatory balance," by permitting the contract claims to "turn on vagaries in the laws of different states, and in the ad hoc decisions of judges and juries within a state." *Id.* at p. 15. Moreover, TCO argues that if *Credit Suisse* renders FERC's "finely tuned agency line drawing . . . off-limits for claims brought under *state* law," then FERC's "careful . . . scrutiny must then surely be off-limits for claims brought under *state* law." *Id.* at p. 16 (emphasis in original).

In response, Plaintiffs point to the West Virginia choice of law provision that appears in TCO's tariff and is incorporated by reference into the service agreements. They argue that "[t]he choice of law provision applies to disputes over service agreements between TCO customers and TCO, the only parties to the agreements." *Plaintiffs' Response*, at p. 22–23. They note that "[t]here would be no purpose for the choice of law provision in TCO's FERC approved Tariff if, as TCO contends, TCO's customers cannot invoke state remedies," and that "TCO's customers are entitled to rely on the choice of law provision in TCO's Tariff in deciding whether to transact business on the TCO pipeline system." *Id.* at p. 23. For these reasons, they believe that they may maintain their state contract claims against TCO.

The provision provides:

*Choice of Law.* Unless otherwise specifically stated in the Service Agreement, interpretation of all Service Agreements or other agreements entered into between Shipper and Transporter, including any provisions of this Tariff related to such agreements, and any disputes arising from such agreements, shall be governed by the law of the State of West Virginia.

*General Terms and Conditions*, 2:04–cv–869, doc. 183–9, at p. 2. In its reply, TCO dismisses this provision as an "obscure piece of boilerplate" that fails to "create or promise any type of remedy." *TCO's Reply*, at p. 10. However, TCO's argument is unconvincing. Under its view, it is difficult to see what the purpose of the choice of law provision would be. Contrary to TCO's arguments regarding the inapplicability of state law, the choice of law provision demonstrates that the parties have contemplated a place for state law all along. Moreover, the provision should allay TCO's concerns about disputes "turn[ing] on vagaries in the laws of differ-

ent states." *TCO's Memorandum in Support*, at p. 15. The Court agrees with Plaintiffs that the choice of law provision should be enforced:

TCO customers are entitled to rely on the choice of law provision in TCO's Tariff in deciding whether to transact business on the TCO pipeline system. TCO cannot lull customers into transacting business on its system by assuring them that they have state law remedies ..., only to claim that those state law remedies are unavailable when a customer invokes them.

*Plaintiffs' Response*, at p. 23.

Notwithstanding TCO's fears, this finding does not "overturn the Supremacy Clause [or] *Credit Suisse.*" *TCO's Reply*, at p. 10. West Virginia contract law is not "clearly incompatible" with FERC's regulatory oversight. *Credit Suisse*, 127 S.Ct. at 2392. In fact, it appears to the Court that TCO's contention that Plaintiffs' contract claims are precluded by *Credit Suisse* is even weaker than its rejected argument that that case precludes Plaintiffs' antitrust claims. *Credit Suisse* at least dealt with antitrust claims; it did not involve a contract claim. Accordingly, to read into *Credit Suisse* the authority to preclude such a claim would be an expansive interpretation indeed.

## C. State Antitrust Claims Only

TCO's only other unaddressed challenge to Plaintiffs' state antitrust claims, set forth in a footnote, is that the West Virginia Antitrust Act, W. Va.Code §§ 47–18–1 *et seq,* "cannot regulate competition in markets outside of West Virginia." *TCO's Memorandum in Support*, at p. 14 n. 15. TCO maintains that its assertion is correct because "[a] basic principle of the federal union is that states may govern themselves, but not one another." *Id.* In support of this proposition, TCO selectively

cites to a single sentence in *BMW of North America v. Gore,* without offering any explication of that case: "[N]o single state . . . [may] impose its own policy choice on neighboring States." 517 U.S. 559, 571, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). However, even a passing glance at *BMW of North America* reveals that this authority offers little guidance regarding whether Plaintiffs may maintain a claim under the West Virginia Antitrust Act. The truism cited by TCO references a hypothetical situation in which one state requires automobile manufacturers, distributors, and dealers in other states to disclose fully every presale repair performed on an automobile. *Id.* at 570, 116 S.Ct. 1589. In the instant case, West Virginia is not attempting to regulate activities occurring wholly outside of its borders. *BMW of North America* simply has nothing to do with the antitrust matter at hand.

■ On the contrary, it is clear to the Court that Plaintiffs' claims should survive. As already discussed, Plaintiffs and TCO executed a choice of law provision settling upon West Virginia law, therefore West Virginia antitrust law. TCO's pipeline network encompasses various states, including West Virginia. *Second Amended Complaint,* 2:04–cv–867, doc. 58, at p. 4. Accordingly, the illegal scheme, if it occurred, resulted "in restraint of trade or commerce in this State." W. Va.Code § 47–18–13. Moreover, the Court notes that TCO's operational headquarters are in West Virginia, and one of the two remaining select shipper Defendants, Defendant Base. Petroleum, is incorporated under West Virginia law and has its principal place of business in West Virginia. *Second Amended Complaint,* 2:04–cv–867, doc. 58, at p. 4, 6. Contrary to TCO's implied assertions, there is no requirement that an antitrust violation occur entirely within the state of West Virginia before West Virginia antitrust law will apply. It is sufficient that a portion of the affected market is in West Virginia. *See, e.g., Precision Piping & Instruments, Inc. v. E.I. duPont de Nemours & Co.,* 707 F.Supp. 225, 226, 231 (S.D.W.Va.1989) (denying the defendants' motion for summary judgment on the plaintiff's W. Va.Code § 47–18–13 antitrust claim, despite the fact that the market at issue encompassed portions of both West Virginia and Ohio). Therefore, the Court denies TCO's summary judgment motion as to Plaintiffs' state antitrust claims.

## IV. CONCLUSION

Pending before the Court are the Renewed Motions for Summary Judgment (doc. 148, Ex. 2, in each of the above-captioned matters) of Defendant Columbia Gas Transmission Corporation (TCO). For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** these motions.

The Court **DIRECTS** the Clerk to send a copy of this written Order and Opinion to counsel of record and any unrepresented parties.